Next case and the last case being argued this morning is number 2008-1016 Aristocrat Technologies against International Game Technologies, Mr. Lupo. Good morning and may it please the court. The judge below held that 47A7 that the Commissioner did not have the authority to revive based on unintentional delay. to revive an application. This is inconsistent with the law. First of all you cannot do what you cannot charge a fee for what you cannot do and if you look at 47A1 it specifically provides that the Patent and Trademark Office may charge fees for both unavoidable and the plain meaning here is that if Congress gave the Commissioner the right to charge a fee for revival because of unintentional delay the Commissioner must also have the right to determine whether there has been an unintentional delay. You need to face directly that which the district court tried to face and that is that the statute says unavoidable in certain places selected by IGT, but it also says unintentional in 41A7 as well as section 111 and the legislative history of 41A7 indicates that that section would permit the Commissioner to have more discretion than the present law to revive abandoned applications. That's the wording of the legislative history. So while there is unavoidable delay in certain sections of the statute, there's also unintentional delay and the Commissioner has that right. Now the other point to make about it is the Supreme Court precedent. The Supreme Court precedent on this is that it is the statutory language not the particular placement of that language that is controlling and that's the United States versus Wellman. That is cited in our brief, the blue brief at page 32. So to hold that the Commissioner lacks this statutory authority to revive based on an unintentional delay to revive an abandoned application would nullify that section completely. What would it mean? You cannot charge a fee for something that you cannot do in the first place. Now I'd like also to address the second reason for reversal and that is the relationship of section 372A to section 111. 372A requires equal procedural treatment of international applications to national applications. If that is to be the case, we have to look at section 111 and section 111 allows a domestic applicant, a domestic application, to be revived for unintentional delay and it says specifically the application shall be regarded as abandoned unless it is shown to the satisfaction of the director that the delay in submitting the fee in the oath was unavoidable or unintentional. Another statute dealing with fee payment and whether or not there has been an unintentional delay. The statute that the district court relied on just said unavoidable. The statute that it relied on just said unavoidable. That's correct. Why was the court wrong? The court was wrong because you have to look at the statute as a whole. You can't just pick a section. The statute as a whole, you mean into the entirety of title 35 or that provision or what? I think it's first of all, we always look at the entire 35 but we look at the sections that are relevant and here those are any that deal with unavoidable or unintentional delay or fee payment, especially one like section 111 that connects the two in the same way that section 41A7 does. What about the threshold question of whether the revival was a proper defense? Section 282. Your honor, we go to that right now. The court already determined, this court, in the Magna Vision case that there's no defense called prosecution irregularities in the patent statute. I don't think it's exactly the same wording but very close. Now try as it may, IGT has been unable to find a defense of improper revival either in the statute or to point to it in the congressional intent for what it was meant by or any words that are consistent with improper revival. Now clearly in section 282 you have you have four provisions. That's correct. The first and the third don't seem to be in debate. The second one perhaps there's some some question, but I think in the end what it will come down to is the fourth section, the catch-all provision. Any other fact or act made a defense by this title? Yes, your honor. Well, why does that not provide a basis for the district court to look at this question? Because if you look at that section, the fact or act part of that section, Congress knows when to use the words or appears to have known when to use the words either no infringement or invalidity in other sections of the statute. Section 273 is an example. It's entitled defense to infringement and that's based on the earlier inventor. Section 185 provides that a patent should be invalid for failure to prescribe to the secrecy portion of the statute. So exactly where did this trial judge go wrong? The trial judge went wrong in two places, at least two places. 41A7, which specifically provides for payment of fee under certain circumstances for unintentional delay. That has to be, as I said before, you can't do, you can't charge a fee for something you cannot do. Secondly, not understanding the legislative history. We're not just saying that anyone who files a petition and sends in a check will prevail. All that the fee entitles you to is consideration. The fee entitles you to consider an issue. Yeah, that's implicit because you can't charge a fee, for example, for obtaining a license, a driver's license, unless there's some ability for the state to know if you're entitled to the driver's license. Here it's the same type of thing. If you say that you can give a fee for unintentional delay, that the commissioner can do that, then he has to have the authority to also indicate what an unintentional delay is. And the second reason that the fee was under the statute that allows the commissioner to decide whether the delay was unavoidable. That's correct. If you can decide whether the delay was unavoidable in one section, you can also decide in another, such as section 111 or 41A7, that it's unintentional. You can't read one portion of the statute to nullify, in effect, another portion of the statute. You have to look at both. And when you look also at the legislative history where it says that the commissioner was given an increased capability in this area, I think that that's very important, too. And the point that I made about the connection between section 372 and section 111, giving the international applicant the right of a national applicant, and section 111 says that there is a fee for abandonment in the case of an unintentional delay. Do you think, do you make an argument in your brief that the regulations of the commission should be given shed some deference? Your opponents come back and cite several cases, including Merck, saying that Chevron deference is not appropriate in the setting in which the PTO does not have substantive rulemaking authority. What's your position on that? You don't respond to that in your reply brief, if I recall correctly. The Chevron deference is only necessary in the case where you can say that it is unambiguous. Suppose that we were to conclude that it's ambiguous. Well, what's your position with respect to Chevron deference? If you conclude it's ambiguous, then I think you go to the legislative history. In the Chevron setting, typically, what you do is you look at all the aides to construction, including the legislative history and statutory construction canons and so forth. And then if you are left with the view that it's ambiguous, you then turn to the agency's construction. Now, is that appropriate in this case, in light of this court's cases dealing with the Chevron issue in other settings? If the court were to conclude, as you have just stated, that it's ambiguous, then you have to go to see under Chevron if the... Well, but that's that's the question. Is Chevron applicable? What I'm asking is, is Chevron applicable to PTO regulations, given the decisions in Quigg and Merck, in which this court, albeit in different contexts, has said Chevron doesn't apply because of the absence of substantive rulemaking authority on the part of the PTO. But there is... Well, I understand. There is substantive rulemaking authority here, though, in the sense that the PTO has the determination to also give fees for all actions that are consistent in the statute. But that's not substantive rulemaking in the normal Chevron sense that relates to the administration and functioning of the patent office, does it not? Yes, that's correct. And there is a difference between the administrative function versus the function, for example, of responding to rejections, objections, etc. The... I think the answer to the question here is you don't have to go to the Chevron exception. Well, but the predicate of the question is that I'm assuming that we get to the point in which we have to decide whether Chevron is applicable or not, and it's not an adequate answer to that question to say that you don't have to reach that point. So what I'm really trying to get from you is, analytically, what's the difference between this case and the pre... the prior cases cited by your opposing counsel saying that the PTO does not have substantive rulemaking authority and therefore Chevron doesn't apply? I don't think that the prior cases attack the authority as much as they attack the application. Okay, under the facts that are specific to those cases, there is evidence of what happened in the record. There is no evidence of that here. This is... the judge has decided that there's no authority of the commissioner to do as the commissioner has done. That is different than saying whether there was a proper application under the facts, such as, for example, in MagnaVision where there was evidence concerning what happened before the Patent Office in terms of recording a meeting between the examiner and the applicant. That's not the situation here. So, I mean, what you really are looking at here is whether or not there's authority under this section of the statute, 41A7, as well as section 372 in... with section 111 for charging a fee for determining whether there is an unintentional delay. Now, I think we were starting on the... I think Judge Lynn asked the question about failure to prosecute. Is that correct? I think so. And I think that if you did ask that question, the... I'm not sure I did. Well, let me address it. The failure to prosecute isn't a good position for IGT in this case because there's a very different meaning for the term that IGT has chosen to use. If you look at the commentary of Pasquale Federico, the co-author of the 1952 Act with Judge Rich, Federico pointed out it's pages 197 to 200 that section 133 has to follow section 132, which calls for re-examination rights after notice of rejection, objection, or requirement. And section 133 says there must be that notice of, again, those... one of those three things. Significantly here, this case doesn't involve any notice of rejection, objection, or requirement placed on the patent applicant. It was simply a petition to change the filing date of the application. So section 133, as argued by IGT, really has no application under the definition of failure to prosecute that you can read from Federico's commentary. And your honors, there's also the argument about the words unless and as used in section 133 here by IGT. If you're going to point to one section and whether or not there's a requirement to be read using the word unless, it's important that you look at the other sections that also use the word. And if you look at section 41A.7, for example, it also uses the word unless and refers to the PCT. To go back to section 133, there's another usage of unavoidable. I'm sorry. Section 133, with the unless, says unless it was unavoidable. Yes. Not unintentional. Sorry, go ahead. That appears to be what made an impression on the trial judge. Well, yes, but your honor, again, if you read Federico, that statute relates to section 132, where the act is either rejection, objection, or a requirement. None of those three are present here. It says on 133, upon failure of the applicant to prosecute the application within a certain time period, six months, of which notice has been given or mailed to the applicant, or within a shorter time. So, again, the failure of the applicant to prosecute the application, if you read Federico, or just generally what we do in patent prosecution, is you respond to either rejection, objection, or requirement, and you have a six-month period. As I was indicating here, neither of those situations is present, because here it was simply a refusal to provide an extension of one day in the filing date requirement. We can save your rebuttal time. Yes, your honor. Thank you very much. We've had a request for argument by the director of the Patent and Trademark Office, and both sides have agreed. We're pleased you're here. Ms. Kelly, please proceed. Thank you, Judge Newman. May it please the court? The main error in the district court's decision was that the court failed to follow the Supreme Court's instruction that the relevant time period for conducting a Chevron deference analysis at the time of a statute's passing. In 1982, when Congress enacted Section 41A-7, there were only two other sections of the Patent Act of Title 35 that permitted any sort of revival of abandoned patent applications, Section 133 and Section 151. And additionally, at that time, no other section of Title 35 referred to 41A-7 was the only section of the statute referring to unintentional abandonment. Accordingly, otherwise, you know, accordingly, it must be assumed that Congress meant that 41A-7 was granting a right, authority, to the PTO to revive patent applications under the unintentional delay standard in 1982 when it amended 41A-7. Otherwise, there was no purpose for that portion of 41A-7 referring to the revival of unintentionally delayed applications, and there wouldn't be any purpose to that statute for another 12 years. And so in that case, that's what we believe is the main crux of the district court's error. And if you look at 1982, the legislative history supports the USPTO's interpretation. Congress said that it was creating two fees for two different standards to allow patent applicants to choose between those standards. So the legislative history completely supports the USPTO's interpretation. Additionally, a lot has been made of the different amendments to 1-11 and to section 41A-7 to allow revivals of patents that had gone abandoned in re-examination. And I think that those events, all the later amendments, can be married together or explained in this way. Every time the USPTO has tried to construe or interpret section 41A-7 narrowly, Congress has informed us that a broader construction or broader interpretation is important, is, sorry, appropriate. When we, when the Patent and Trademark Office originally construed 41A-7 not to apply to patent applications that had gone abandoned under section 1-11, and we changed our minds later when we realized that that we were probably reading 41A-7 too narrowly, Congress ratified our later statement that 41A-7 applied, the revival of unintentionally abandoned applications, those applications that had gone abandoned under section 1-11, that 41A-7 also applied to that by amending section 1-11 to refer to unintentional delays. On the flip side of that, in CATRAPAT, when the agency said no, section 41A-7 doesn't apply to patents during re-examinations, and so we will not allow a patent owner to revive a patent that has gone abandoned for failure to prosecute during re-examination, Congress then came in and said no, you're, you know, reading 41A-7 too narrowly, and it amended 41A-7 to, again, provide authority to the PTO to permit applicants to revive their patent applications, or in this case, patents under the unintentional delay standard. And so when we're looking at those subsequent amendments, the amendments prior to 1982, they're explained, can be explained in that way. Whenever the PTO has tried to interpret 41A-7 narrowly, Congress has let us know by amending the statute that that narrow construction or interpretation is inappropriate. Could I ask a question going to the Chevron issue? What's the PTO's position as to the extent to which the office's regulations are subject to Chevron deference by the courts? We believe that they are. For the reasons outlined in our brief, they are long-standing. They have been applied numerous times. Well, I'm asking really a broader question. This court has a couple of decisions saying that the PTO does not have substantive rulemaking authority, and hence, at least with respect to the subject matter of those cases, does not, is not entitled to Chevron deference. Do you think, A, the is the office's position those cases are no longer good law, or B, that they are limited in some way that would make Chevron applicable here, or C, that there is some, which is the same as B, really, that there's something about this case that entitles us to look at this case through a Chevron filter? We believe that Chevron applies because these rules are not substantive rules, that these are procedural rules. That if you look to your predecessor court's instruction in In re van Ornum, and what the court said in that case was, even though a procedural rule may have some substantive aspect, it, that rule is not suddenly converted into substantive, substantive rulemaking just because it has a substantive aspect. One of the problems here, which is a problem that this just plagues the law in many areas, is the word procedural has a real weasel character to it. Sometimes it is used to mean dealing with process as opposed to what I think you're talking about here when you say substantive is the substantive rules of the patent law, as opposed to the procedures by which the office runs its business. Sometimes, however, there's a distinction between legislative and non-legislative or procedural rules on which the Chevron line is drawn. Are you saying that the PTO does have, call it, substantive rulemaking authority, that is to say rulemaking authority that would have the effect of law binding on the courts with respect to procedural questions, but not with respect to substantive ones. Is that the line you're drawing? I, I, I know that that particular question you would love an answer to, but I'm not authorized to answer that question, but. Well, but that question is presented by this case. I think. Well. I mean this, you could well view this in unlike Quigg and Merck, as which dealt with questions of the patentability and extent, the period of an extension and so forth, all very much substantive patent law questions. You could view this as a question having to do with process before the, the PTO. And if your position is that Chevron applies to those kinds of process before the PTO questions, then Chevron applies to this case, it seems to me. Well, it is our position that Chevron applies to this case. And it, we believe that Chevron deference applies to this particular regulation. All right. In that context. That's because of what? Because this is not a substantive? Because this is not substantive. The PTO's position, and it's more fully outlined for this court in GSK versus students, which is a case that this court will hear shortly, in, in that case, what we have explained, and we think that the In re Van Ornum and the Stevens versus Tomei decisions support our view that substantive, substantive rulemaking would be rulemaking that relates to sections 101, 102, 103, and 112 first paragraph. Those things that determine what, you know, whether something's patentable subject matter, whether something is new, useful, and non-obvious, whether something is adequately described to enable one to make or use an invention. Those things are the substance of patent law. All these other things are, are just procedural. These are things that Congress has said, okay, PTO, you figure out how to do this. PTO, you figure out what forms and what ways and what is necessary for a patent applicant to show that they have unintentionally abandoned their patent application. So to be clear, you think that the PTO has been granted legislative rulemaking authority as opposed to mere interpretive authority, legislative rulemaking authority subject to notice and comment requirements and Chevron with respect to procedural questions, am I right? That's what I interpreted your, your point to be, but if I'm misinterpreting. I'm not authorized to speak on the larger issue. But that's what you effectively just said. What I'm talking about this, well. Isn't that pretty much what it comes down to? In this case, I'm saying this is a procedural rulemaking and it was subject, subject, in this case we're talking about procedural rulemaking. We're talking about something that went through notice and comment. Right. Rulemaking. So it is legislative rule, right? As opposed to merely an interpretive rule such as might appear in a policy statement. I believe that it's an interpretive and it, we're just interpreting what Congress said. At the beginning of 41, Congress said, the commissioner shall. And we, we are just interpreting the legislation. We are not, we're not making our own legislation. We're just interpreting what Congress told us to do. So in, in that sense, because I know in patent, a lot of this. The basic question in Chevron, that happens all the time in Chevron situation. There are two different types of agency actions that can be subject to Chevron. One in which the agency is frankly filling a gap that Congress either didn't intend or did intend for the, and the agency fills it. Or in which the agency says, we just think there's an ambiguity here and this is the way we interpret the statute and that's our interpretation. And if the courts are persuaded there's an ambiguity and this is, the agency is authorized to do substantive rulemaking, then in that situation, I'm sorry, legislative rulemaking, then in that situation, the courts will defer, but otherwise not. And this seems to me to be an important element of this case because what the PTO has said is this is our take on the statute. And our, the question for us is, do we pay attention to that? Indeed, pay attention in the very deferential way that Chevron instructs us in appropriate cases to do, or do we simply say, well, that's their view and it's not worth a whole lot of weight. Well, first of all, I don't think you need to go to our regulations. I think when you look at the Chevron court informs, instructs courts that the relevant time for looking, conducting the Chevron analysis is at the time a section 4187. We, I believe, the agency believes we satisfy the first step of the Chevron analysis. Congress plainly spoke. Congress plainly authorized the revival of unintentionally abandoned patent applications by its plain language in 1982. If you don't believe that, then we move to the second step of Chevron when we're now focusing just on the statute alone. In that case, when we're looking at the statute, then if you believe that there's a gap or an ambiguity in Title 35, then the agency should get Chevron deference to its reasonable interpretation of the statute that was supposed to administer. And one of the reasons that we focused on the statute in our brief rather than going to the regulation is that was, that's what the district court did. The district court focused on that statute. But if you don't believe that Congress was clear in 1982 or you don't believe that we were just gap-filling in ambiguities, then I, what I would say is this is merely a procedural rule. If you want, if you want more word from the government as to whether we have substantive rulemaking authority, then I guess my position, if we're to be truly helpful, is to say that we could supplementally brief that. Okay, I think we need to move on and we have your position. Mr. Soros. Yes, good morning, your honors. May it please the court. The plain statutory language is dispositive on this appeal. There are two key points that are not in dispute. One is that Aristocrat abandoned its application for failure to timely pay the national stage fee under 371 D. The second point is that section 371 D states in clear and unambiguous language that the only way to revive such a, such an abandoned application is by making a showing of unavoidable delay. Despite that congressional mandate, the PTO says that we can revive applications abandoned under 371 D without a showing of unavoidable delay. According to the PTO, you can ignore 371 D and go to 41 A7, which, which somehow authorizes them to revive abandoned petitions under 371 D under a standard contrary to what's stated in 371 D. And there are two fundamental problems with what they say about 41 A7. The first is that 41 A7 doesn't say anything of the sort. When Congress wants to establish a revival standard, it says so in express language. It does it in section 111, 122, 133, 151, and 371 D. There's no such language in 41 A7, which simply sets fees for particular standards. The second problem with the PTO's position. But in 1982, when 41 A7 was passed, if what you're saying is, is valid, that means that Congress passed a statute that provided for a fee for revival of an unintentionally abandoned application, which was in effect a hollow gesture until 12, 14 years later when 111 was. In 1994. You know, that's not, not correct, Your Honor, because, I mean, that's the PTO's primary argument in favor of their position, that there would have been this gap in operability for 12 years. But if you look at, in 1982 at 41 A7, what it did, it set a lower fee for what were then the only two statutory types of abandonment and revivals, 133 and 151, both of which required showing of unavoidable delay. It set a higher fee for revivals of all other unintentionally abandoned applications. But your argument is that the Patent Office didn't have the authority to do that. So they set a fee for an act that was a hollow gesture. No, there were only these two statutory means, but there have always been other ways to abandon applications and get them revived, in addition to what's in the statute. In fact, Congress later codified some of these additional ways, and so did the PTO. I mean, to give you an example, suppose I was prosecuting an application and the examiner said, your informal drawings are illegible, send me better ones within 60 days or I'm going to declare this abandoned. So I get some new drawings together, and instead of sending them to the PTO, I make a mistake and I send them to the PO, the post office. So he doesn't get them in 60 days, he declares the application abandoned. When I get the notice, I find out what happened, I bring it to his attention, and he says, well, you know, it was inadvertent, you made a mistake. He looks at 41A7 and says, well, you've got to pay the fee for an unintentional abandonment if you want to revive it. So 41A7 has been paid. Wait, wait, wait, in your hypothetical, then what authority does the Patent Office have to accept that fee? Well, it wasn't, well, it had... 41A7? 41A7 sets the fee for, it had inherent authority to revive abandoned applications. There's nothing in the Patent Act that says... Why doesn't it have an inherent authority on the circumstances of this case? Because it can't override express statutory provisions that provide the standard. And here where it was abandoned pursuant to 371D, you have to look at 371D to see what the standard was. And so in that sense, you know, it's overriding an express statutory standard, and it's very important to... So 371D does provide for the revival of, on the basis of unavoidable abandonment, but doesn't say that's the only basis. It does, it does. It says if you abandon for failure to pay the national stage fee in a timely way, it says it shall be deemed abandoned unless you make a showing of unavoidability. It gives no discretion to the Commissioner there. You know, there's a second point too, which is that 371D, that unavoidability provision, was enacted two years after 41A7. So even if 41A7 somehow authorized unintentional... Revival is based on unintentional delay in some kind of broad sense, which I don't think it does. It just simply sets fees. Even if it did, it would be trumped by the later and more precise enactment that Congress made two years later under the PTO's position that would be completely meaningless. But why is this issue properly before the court in the first place? And this gets to the Section 282. You're not arguing that 282 Section 1 or 3 applies? No, 2 and 4. And, you know, we've made our statutory argument in our brief. We think that there was, you know, a fact that comes under the catch-all provision in Subsection 4, namely the... It really doesn't fall under 2 either. Well, we think it falls under 2 under the 133 provision, but also there are other arguments under 2, which calls for conditions of patentability. I mean, if you were looking at the continuation patent involved in this case, you would have to look at whether the parent was validly revived in order to determine whether the continuation patent is valid. And there's no reason... And that's an express condition of patentability set forth in 102B. There's no reason, if you find out that the parent was improperly revived, why that wouldn't knock out the parent as well. What section of the statute do you rely on as a fact or act made a defense? Well, 371D says there has to be a showing of unavoidability. The PTO revived this petition, this application, without a showing of unavoidability. That's a fact or act. In fact, if you could not challenge patent validity on this basis, then those very clear congressional mandates in the statute, you know, you shall unless, would become meaningless. There'd be no way to judicially review them under the appellant's theory, which, by the way, the PTO has not supported in this case. They're standing on their own, and we're not aware of any court that has accepted the notion that you cannot challenge the propriety of a revival on a patent infringement case as a defense. I would like to address the... You argue at one point in your brief that I think that setting aside whether this falls within one of the subsets of 282, if I understand the argument that this is litigable in an inter partes action under the APA. Well, the APA... The APA doesn't provide a vehicle for this kind of challenge, correct? Well, the APA is a backup argument if you reject the 282 argument. I'm trying to see if it's a bad backup argument. Well, I understand. And let me ask the question this way because they cut to the chase. Is there any APA case that you know of, case in which the cause of action is created by the APA that doesn't involve the sovereign or his agent as the defendant? Yeah, we cited one in our brief, a Supreme Court case. That was not an APA case. The one you're talking about is the Family Medical Leave Act case. Granger, I think is the name of it? Yeah. That was not an APA case. There have been several district courts that have accepted the APA argument. The Autodesk case, for example. Judge Rakoff has a case, that's right, in the Southern District of New York. But I'm wondering whether you've got any case setting aside those two cases involving this precise issue in which, as a general matter, the APA is said to grant the cause of action. No, and I think the reason, though, is the distinct nature of patent infringement cases where the defendant often does challenge government action, but not at the time of the government action. It's sort of, in many cases, impossible to do it at the time. Question of whether you'd have standing or even know about it. So you necessarily do it later. And the question then is, can the district court take the APA standards and apply them, even though the government is not a party? Are you required to bring the party and the government and name them as a party in every such case? We think not, and we think therefore the APA does serve as a backup argument. I thought that was resolved in the Zerko decision, that it's broadly applicable. Well, I think it has to be. Well, Dickinson was the party in Zerko. Of course, that's the government. Yeah, you know, ultimately there's a common-sense issue here, which is that if you've got an application that was abandoned and not properly revived, you didn't have a live application that could mature into a patent, and therefore you can't enforce an invalid patent against an alleged infringer. And so if you don't have the right to challenge that improper revival, again, you effectively negated these very clear congressional mandates, the shale and unless language that's found in 133 and 371d. There'd be no way for courts to take a look at this, and it's essential that these congressional mandates be given effect. I would like to address the Chevron point. First of all, we don't think that these statutes are at all ambiguous and that there's no need to get into the other side. But if you did, we, you know, the court did say in animal legal defense and in Merck that it's the PTO's interpretation of the patent statutes doesn't get Chevron deference. We think it's a little broad. In other words, if you look at 41A7, which sets fees, certainly the PTO would have discretion and would get deference as to whether it accepted those fees by check or money order or wire transfer. Because there's nothing in there about such things in the statute, and so it's implicitly delegated to the PTO. But the notion that they could interpret the Patent Act in such a way as to override substantive standards that Congress expressly inscribed in the Act... That's just step one of Chevron. Everybody knows that Chevron does not allow an agency to flout the will of Congress. The question comes up, though, if there is ambiguity. So let's assume, contrary to everybody's assumption on that side of the bench, that we should conclude that there is ambiguity here. The $64 question is, is this the kind of case in which the PTO's authority, rulemaking authority granted by Congress, albeit perhaps circumscribed, does this fall within the circle, as Ms. Kelly and Mr. Lupo were arguing, or does it fall outside of the circle, ala Quigg and Merck, and if so, why? It falls outside because, you know, the substantive procedural distinction is not always so easy to apply. But where Congress put the... Congress didn't in any sense delegate to the PTO the right to fashion standards for the revival of abandoned applications. Congress decided to put those right in the statute, and it made a policy choice by doing that. It said, we're not in favor of easy revival. We want deadlines to be taken seriously, and when you miss those deadlines, they're supposed to have serious consequences. So it set a very difficult standard, at least in some sections of the Patent Act, in 371D and 133 and 151, and those are the ones that apply here. It made it very difficult. It said no to easy revival. You know, the other amicus in this case, the industry organization, I'm sure they represent the views of a lot of other industry organizations that want to be able to disregard deadlines and get easy revival of their abandoned applications just by checking a box that says unintentional and paying a fee. But Congress said no to easy revival, and even if these groups are right as a matter of policy, they should not be using their members' dues money to file amicus briefs. They ought to be using it for lobbyists, because only Congress has the authority to modify that express statutory standard that's set forth in Section 371D. Now, I would like to address the question of unfairness that both the PTO and the other amicus raised in their briefs. First of all, there's nothing unfair about applying a statute as Congress wrote it and not allowing an agency to deviate from it, but certainly there's nothing unfair to aristocrat here. I mean, the record shows a deplorable prosecution of a patent, and it is only itself to blame for its situation. But what about the many other patent owners that might be affected? I think the important thing to remember there is that all of them abandoned their applications for failure to meet a deadline, and in most cases they would have not have been able to revive them under the proper statutory standard. So, you know, there's always some unfairness when a regulation is deemed to be contrary to a statute in terms of people who have relied on it, or when a statute is deemed to be unconstitutional. But I think there's a lot less unfairness here, because those people have enjoyed their statutory monopoly for many years, however many years, that they've had their patents, when they never should have had the patent in the first place, at least in most cases. Finally, our brief shows in the alternative that even under the unintentional standard that aristocrat advocates, that the PTO acted arbitrarily and capriciously in reviving the application, because the record shows a plain refusal to comply with the deadlines that were set forth to them, not only in the statute, but in notices sent from the PTO. So even if the PTO's misguided regulation were upheld here, contrary to what the statutes say, it acted arbitrarily and capriciously in reviving for unintentional delay. And I see I'm out of time. Okay, thank you, Mr. Sarris. Mr. Lupo, you have a couple of minutes. Thank you, Your Honor. First of all, regarding the Chevron questions that we've all addressed, this is not a substantive rulemaking situation here. It's an implementation of the power given by the statute. Chevron doesn't apply when the Patent Office tries to legislate, but here the Patent Office is not legislating. This is procedural implementation in the Act. The fact that two statutes say that unavoidable is no justification, I think ignores 41A7 because of the mention of both in that section. So you cannot render Section 141A7 meaningless as I think Judge Linney termed it, that it would, I'm trying to say the exact language, a hollow gesture. Gesture. So here the PTO didn't create unintentional as a standard. Congress did and the PTO rules just implemented. Also, what about the argument that well, even if 41A7 did establish a basis for unintentional revival that Section 371D passed after 41A7 says that failure to comply shall be regarded as abandonment unless it's shown that it's unavoidable. Does that supersede whatever effect 41A7 might have had? No, Your Honor, because there's no statement in there that what is in 41A7 is precluded. There's no change to that section nor does this change to 371D say that that's the only way to revive. In fact, the legislative history there indicates that the amendments were made to these subsections and 371 is one named, this is page 38 of our brief, set forth a legislative scheme to provide greater flexibility in the PTO for handling of international applications and that triggers over to, of course, Section 372, which we argued earlier, and its relationship to Section 111, which is a section for paying a fee in the situation where there is an unintentional delay. Also, with regard to the legislative history of 371, again, at page 38, it says, in addition, these subsections, by relaxing the requirements which international applicants must satisfy by the commencement of the national stage, give international applicants benefits similar to those given national applicants with respect to the time for filing the national fee oath or declaration. So, again, we fall over to the reference to Section 111 and with the change of the application of Section 372, when looked at with 111, provides. And as for Judge Rakoff in New York, he found that it was not unintentional. Here in this situation, IG is arguing that it's the PTO that cannot even consider the question of unintentional delay. So that is, I think, a difference to note. Okay, I think we've exhausted your time, Mr. Lupo. Thank you, Your Honor. Thank you, Mr. Lupo, Ms. Kelly, Mr. Sarles, the case is taken into submission.